# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8829 | **DATE** | 9/30/2004 |
| **CASE TITLE** | Robert Terry vs. American Airlines, Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment (Doc. No. 15-1) is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | 2 | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | SEP 3 0 2004 | | |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | | | 35 |
| ✓ | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | 9/30/2004 | | |
| | | | | date mailed notice | | |
| ETV | courtroom deputy's initials | | | ETV | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | | |

U.S. DISTRICT COURT

CLERK

2004 SEP 30 PM 4: 49

ROBERT TERRY,                    )
                                 )
            Plaintiff,           )
                                 )
     v.                          )    No. 02 C 8829
                                 )
AMERICAN AIRLINES, INC.,         )    Judge Rebecca R. Pallmeyer
a corporation,                   )
                                 )
            Defendant.           )

**DOCKETED**

SEP 3 0 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Terry is a pilot for Defendant American Airlines, Inc. In late 2000, American referred him for a "fitness for duty" examination. He entered the Betty Ford Center, where he acknowledged being an alcoholic and was diagnosed as alcohol dependent. In this lawsuit, Terry contends that he is not in fact alcohol dependent; that he has not had a drink since he entered treatment; and that he told his therapists that he is an alcoholic only because he had no choice and would otherwise not have been released from treatment. American's refusal to return him to the air, Terry claims, constitutes discrimination on the basis of a perceived disability in violation of the Americans with Disabilities Act and on the basis of his race, African-American, in violation of Title VII of the Civil Rights Act of 1964.

Defendant American Airlines has moved for summary judgment. American argues that Plaintiff is not a "qualified person" because under Federal Aviation Administration regulations, Plaintiff may not return to flight status until he has a first-class medical certificate or a "special issuance" from the FAA. American insists it is prepared at any time to forward Plaintiff's medical records to the FAA for its review, but he has refused to consent to the release of his records. American contends that it is Plaintiff's failure to obtain FAA clearance, not his race or perceived disability, that is the reason he has not resumed work as a pilot. For the reasons set forth in this opinion, American's motion is granted.

35

**The Parties**

Defendant American Airlines, Inc., is an air carrier in the business of transporting passengers in interstate commerce. (Def.'s 56.1 ¶ 2.) American holds an operating certificate from the Federal Aviation Administration ("FAA") and is required by that certificate to maintain safety as its highest priority. (*Id.* ¶ 3; 49 U.S.C. §§ 40101, 44705.) Plaintiff Robert Terry has been employed by American since 1979. In 1989, Terry became a captain, with ultimate command of the airplane during flight and final responsibility for the safety of passengers, crew, cargo, and equipment. (Def.'s 56.1 ¶¶ 5, 6.)

In 2000, American had four Chief Pilots at O'Hare: Captain Mark Pospisil, Captain Steven Allen, Captain Ed Vogler, and Captain John Jirschele, who held the position of Base Manager. (*Id.* ¶ 22.) Dr. Nestor Kowalsky was until 2003 the Area Medical Director at O'Hare, responsible for working with pilots and unions regarding medical eligibility for safety-sensitive duties and assisting with completion of the evaluation of any psychiatric or psychological fitness-for-duty examinations. (*Id.* ¶¶ 24, 25.)

**FAA Flight Regulations**

Federal regulations require any pilot to hold a first class medical certificate from the Federal Air Surgeon of the FAA. (*Id.* ¶¶ 7, 8; 14 C.F.R. §§ 61.3(c), 61.23(a)(1), 121.437(a).) Under FAA regulations, a first-class medical certificate expires six months after the pilot's medical examination. 14 C.F.R. § 61.23(d)(1)(i). Regulations prohibit a pilot from flying if he is aware of any condition that

---

[1] The facts are presented in the parties' statements pursuant to Local Rule 56.1. Defendant's Statement of Undisputed Material Facts is cited as "Def.'s 56.1 ¶ ___"; Plaintiff's Response is cited as "Plaintiff's Response ¶ ___"; Plaintiff's Statement of Additional Facts is cited as Pltf.'s 56.1(b)(3)(B) ¶ ___"; and Defendant's Response is cited as "Def.'s Response ¶ ___".) Where Plaintiff has made no response to paragraphs of Defendant's 56.1 Statement, those paragraphs are deemed admitted. Where Plaintiff has offered support for his denials or for additional statements of fact, his version is credited for purposes of this motion.

would disqualify him under FAA medical guidelines, even if he holds a valid medical certificate; regulations also prohibit an airline from permitting a pilot to fly unless he has a current medical certificate and is otherwise qualified.  (*Id.* ¶ 9, 10; 14 C.F.R. §§ 61.53(a)(1), 121.383.)  FAA regulations impose the following standards for eligibility for the required medical certificate:

> (a) No established medical history or clinical diagnosis of . . .
>
> (4) Substance dependence, except where there is established clinical evidence, satisfactory to the Federal Air Surgeon, of recovery, including sustained total abstinence from the substance(s) for not less than the preceding 2 years.

A further and independent requirement for eligibility is

> (B) No substance abuse within the preceding 2 years defined as:
> (1) Use of a substance in a situation in which that use was physically hazardous, if there has been at any other time (a similar incident) . . .;
> (2) A verified positive drug test . . . ;
> (3) Misuse of a substance that the Federal Air Surgeon, . . . finds—
> (i) Makes the person unable to safely perform the duties or exercise the privileges of the airman certificate applied for or held; or
> (ii) May reasonably be expected . . . to make the person unable to perform those duties or exercise those privileges.

14 C.F.R. § 67.107. One further eligibility requirement is that the pilot have no "established medical history or clinical diagnosis of . . . a transient loss of control of nervous system function(s) without satisfactory medical explanation of the cause." 14 C.F.R. § 67.109.

Under current regulations, a diagnosis or history of alcohol dependence does not necessarily disqualify a pilot, so long as he has obtained treatment, remained abstinent, and successfully participated in "aftercare" programs.  (Def.'s 56.1 ¶ 18.)  During the time period relevant here, American had a three-stage program for alcohol-dependent pilots.  The program required that the pilot (a) acknowledge the problem; (b) undergo evaluation and therapy, usually including an inpatient treatment program and extended aftercare; and (c) following successful therapy, complete further psychological and psychiatric testing to rule out other disqualifications.

3

(*Id.* ¶ 19.)[2]

**Incidents in April 2000**

On April 1, 2000, Plaintiff planned to exercise the privilege he enjoyed as an American employee to fly as a non-revenue passenger from Chicago to Atlanta. (*Id.* ¶ 27.) Dressed in full uniform, Plaintiff arrived more than ten minutes before the airplane's scheduled departure, when, as he knew from his experience, the plane would not yet have "pushed back" from the gate. When the jet bridge agent told Plaintiff that the plane had in fact already pushed back, Plaintiff was suspicious. He proceeded to walk down the jet bridge and confirm his suspicion that the agent's statement was not true and that the plane remained in the gate area. Plaintiff had a brief discussion with the jet bridge agent in which he called her "worthless." (Plaintiff's Response ¶ 28.) Although it was not his direct responsibility to oversee the boarding process, Plaintiff "successfully enabled" three passengers, who presumably otherwise would have been denied boarding, to board the airplane when he confirmed to the gate agent that the plane had not pushed back. (*Id.* ¶ 29.)

Captain Pospisil received a report concerning the April 1 incident. A Customer Service Manager reported that Plaintiff had addressed the jet bridge agent "in an extremely abusive manner" and that when she asked him to leave the jet bridge, he caused a "scene" at the gate podium. The jet bridge agent reported that Plaintiff had approached her while "yelling and waving his arms," had called American's agents "dumb" and "ignorant," and had accused her of not knowing how to do her job. The pilot, who claimed he could hear the exchange through the open cockpit window, characterized Plaintiff's behavior as "an embarrassment to us all." Plaintiff denies these accusations, but does not deny that the reports were in fact made to Captain Pospisil. (Def.'s 56.1 ¶ 30; Plaintiff's Response ¶ 30.) He points out, further, that the jet bridge agent was never disciplined for the incident and that the customer service manager said nothing to the jet bridge

---

[2]      Plaintiff denies this paragraph of Defendant's Rule 56.1 statement, but as Defendant observes, the deposition transcript he cites does not contradict paragraph 19.

agent about her false statement that the plane had pushed back. (Pltf.'s 56.1(b)(3)(B) ¶ 112.)[3]

Eleven days later, Plaintiff was flying as Captain on a flight leaving Miami. (Def.'s 56.1 ¶ 31.) An agent entered the plane and, without checking to see if there was room for his bags in another space on the airplane, advised Plaintiff that his bags were going to be moved from the forward cabin of the airplane to the baggage section of the airplane in order to make room for a wheelchair. (Id. ¶ 32; Plaintiff's Response ¶ 32.)[4] Plaintiff notes that the agent did not ask to move anyone else's bags and made her statement "as a command instead of a request." (Pltf.'s 56.1(b)(3)(B) ¶ 115.) He points out, further, that she made no attempt to find out whether there was room in the other forward cabin, nor did she ask whether bags could be removed from that other cabin rather than removing Plaintiff's. (Id.) Plaintiff became annoyed, raised his voice, and told the agent that if his bags were moved, the flight would not move. (Def.'s 56.1 ¶¶ 33, 34.) In response to a false allegation that there had been physical contact between Plaintiff and the agent, a chief pilot from the Miami base was called to the aircraft. (Plaintiff's Response ¶ 35.)

This incident also resulted in a report to Captain Pospisil. Specifically, the Flight Operations Manager reported that when she boarded the aircraft to ask Plaintiff to move his bag, Plaintiff threatened not to proceed with the flight, using "a very loud and demanding voice." When she spoke to Plaintiff about the rules concerning wheelchair storage, Plaintiff "put his hands up towards my face so as to not listen to me and told me to get off his aircraft." Plaintiff denies that the

---

[3] Plaintiff asserts that American's goal, in 2000, was to have all passengers boarded ten minutes before the scheduled departure and to pull the jet bridge back five minutes before the flight's scheduled departure. (Pltf.'s Rule 56.1(b)(3)(B) ¶ 113.) Certain of the documents he cites for this assertion ("Exhibit 5," and pages 50-52 of Pospisil's Deposition) are not in the record, however, and the cited pages that are in the record (Pospisil Deposition, at 56-59) do not support the assertion.

[4] American's flight manual provides that one handicapped passenger per flight must be permitted to store a collapsible wheelchair in a cabin closet; the wheelchair has "closet space priority over crew luggage." (Def.'s 56.1 ¶ 38, citing Flight Manual, Ex. 8 to Pospisil Deposition.)

regulations require that a wheelchair be stowed in the forward cabin, but does not deny that the Flight Operations Manager complained about the incident, calling his conduct "totally uncalled for" and "unprofessional," and observing that his "behavior and insensitivity towards handicap[ped] passengers [was] totally unacceptable." (Def.'s 56.1 ¶ 36; Plaintiff's Response ¶ 36.) Nor does Plaintiff deny the accuracy of the Miami Chief Pilot's e-mail report to Captain Pospisil that when the Chief Pilot arrived at the plane and asked Plaintiff about the wheelchair, Plaintiff got up out of his seat, showed the Chief Pilot where his bags were stowed and stated, "they ain't moving." (Plaintiff's Response ¶ 37.) The Miami Chief Pilot also reported that the plane left fifteen minutes late. (Def.'s 56.1 ¶ 37.) Plaintiff attributes the delay to the conduct of the agent, but offers no evidentiary support. (Pltf.'s 56.1(b)(3)(B).) It is undisputed that neither the agent nor the supervisor in Miami was disciplined for this incident. (Id.)

On April 12, 2000, Captain Pospisil directed Plaintiff to meet with him to discuss these two incidents. Plaintiff attempted to do so on April 12 or 14, but arrived just one-half hour before the scheduled departure of a flight for which he was the pilot. Captain Pospisil determined not to proceed with the meeting at that time, as he believed Plaintiff should be on the aircraft and that such a meeting would require Plaintiff to have union representation. (Def.'s 56.1 ¶ 39.) Plaintiff denies that Pospisil told him that a union steward was necessary or that Plaintiff should come back another time. (Plaintiff's Response ¶ 39.) He also denies Defendant's assertion that Captain Pospisil made repeated efforts to contact him, but acknowledges that his answering machine at home was broken and that he was unable to retrieve e-mail at that time. (Id. ¶ 40.) Plaintiff ultimately met with Captain Pospisil, Captain Vogler, and Tom Bloom on May 23, 2000, at which time he reviewed information about the two incidents and had the opportunity to tell Captain Pospisil "what really occurred." (Def.'s 56.1 ¶ 41; Plaintiff's Response ¶ 41.)

**Further Reports Concerning Plaintiff's Conduct**

Between April and November 2000, Captain Pospisil received reports about Plaintiff from Captain Gary Johnson, who was the head of the pilots union's Professional Standards Committee at O'Hare. (Def.'s 56.1 ¶ 43.) Captain Johnson told Captain Pospisil that other pilots were not comfortable flying with Plaintiff because of his volatility, belligerence, and mood swings. Captain Johnson also told Pospisil that he would not attempt further contact with Plaintiff because Plaintiff had yelled at Johnson and refused to listen to him. (*Id.*) Plaintiff denies yelling at Captain Johnson and asserts that Johnson's allegations are false, but he cites no evidence that rebuts Captain Pospisil's testimony that these complaints were in fact made during the relevant time period. (Plaintiff's Response ¶ 43.) Also during this time frame, one of Plaintiff's co-pilots, First Officer Jim Bennett, reported to Captain Pospisil that Plaintiff had fallen asleep in the cockpit, suffered from volatile mood swings, and had an unusual eating pattern. (Def.'s 56.1 ¶¶ 44, 45.) Plaintiff denies that Bennett's report was accurate, but offers no evidence that rebuts Captain Pospisil's testimony that Bennett made the statements. (Plaintiff's Response ¶ 45.)[5]

In August 2000, Captain Pospisil spoke to Plaintiff about an incident in which he missed a flight for which he was scheduled. Plaintiff explained to Pospisil that he slept through his alarm. (Def.'s 56.1 ¶ 46.) In an affidavit, Plaintiff denies this conversation occurred, (Plaintiff's Response ¶ 46), but Defendant correctly notes that this denial must be disregarded as inconsistent with Plaintiff's deposition testimony that, although he was uncertain of the date, he did remember the conversation "happening sometime." Plaintiff asserts that other pilots have not been disciplined or counseled for missing flights; Defendant responds that Plaintiff also was not disciplined, and that Captain Pospisil is unaware of any other pilot who missed a flight because he slept through his

---

[5]     Plaintiff's statement "Pospisil was not even sure it was Bennett who told him that Plaintiff had 'volatile' mood swings" is inaccurate. Pospisil testified, "I remember more specifically that comment coming from Jim Bennett." (Pospisil Dep., Ex. B to Def.'s 56.1, at 99.)

alarm. (Pltf.'s 56.1(b)(3)(B) ¶ 118; Def.'s Response ¶ 118.)

Another Chief Pilot, Captain Mark Allen, disciplined Plaintiff in November of that year concerning Plaintiff's failure promptly to contact Captain Allen regarding an aircraft maintenance issue. (Def.'s 56.1 ¶ 48.) Although Plaintiff denies any wrongdoing, he acknowledges that Captain Allen disciplined him, accused him of insubordination, and raised with Plaintiff the matter of his purported failure promptly to respond to Captain Pospisil's request for a meeting in April. (Plaintiff's Response ¶ 48.) He acknowledges, further, that Captain Allen issued a written disciplinary notice and docked Plaintiff for 18 hours of pay; after an arbitration hearing, Plaintiff's lost pay was restored. (Def.'s 56.1 ¶ 49; Plaintiff's Response ¶ 49.)

**Physical Evaluations**

In November, Captain Pospisil discussed his concerns about Plaintiff's behavior with Base Manager Jirschele and with Dr. Nestor Kowalsky. (Def.'s 56.1 ¶¶ 50, 51.) On December 4, 2000, Captain Pospisil, Captain Allen, and Tom Bloom of the pilots union met with Plaintiff. Pospisil directed Plaintiff to report to Dr. Kowalsky and obtain a medical evaluation within ten days. (Def.'s 56.1 ¶ 53.) On December 11, 2000, Plaintiff did report to Dr. Kowalsky, who performed a full physical examination, including a blood pressure check, and drew blood for testing, but did not administer a drug or alcohol screening. (Id. ¶¶ 55, 56.) Dr. Kowalsky also referred Plaintiff to two medical professionals on an FAA-approved list but not employed by American, Dr. David Altman, a psychiatrist, and Randy Georgemiller, Ph.D., a neuropsychologist, for further examination. (Id. ¶¶ 57-59.) Plaintiff did meet with Dr. Altman and Dr. Georgemiller in December 2000 and January 2001. (Id. ¶ 61.) Dr. Altman reviewed the results of the blood tests Dr. Kowalsky had performed and noted the presence of "elevated GGT and CDT levels," which are indicators of alcohol abuse. (Id. ¶ 62.)[6] Dr. Georgemiller reported "generalized chronic deficits" in such skills as "verbal social

---

[6]     The GGT test reflects elevated levels of gamma glutamyl transpeptides; elevated
(continued...)

reasoning, sustained attention and concentration, abstract and novel problem solving, and flexible thinking." In addition, Plaintiff's performance on a measure "normed for pilots" – including "visual motor speed and accuracy as well as complex processing and flexible thinking" was, in Dr. Georgemiller's words, "suppressed on all dimensions." (Id. ¶ 63, quoting Neuropsychological Evaluation Report ("Neuropsych Rep."), Ex. 6 to Altman Dep.) Dr. Georgemiller's report states that Plaintiff admitted drinking "about" three drinks, apparently nightly; it also records that Plaintiff had "admit[ted] to longstanding heavy alcohol ingestion." The report states, further, however, that Plaintiff was never intoxicated, never lost consciousness, had never been charged with drunk driving, and had never heard concerns expressed by family or friends concerning his alcohol use. The report notes that the deficits described above are "compatible" with alcohol use, but Dr. Altman conceded there are many other potential sources for such deficits, as well. (Plaintiff's Response ¶ 63; Neuropsych Rep.)

Reviewing his own findings and those of Dr. Georgemiller, Dr. Altman was not able to make a diagnosis of alcohol abuse under the standards set forth in DSM-IV, but nevertheless concluded, based mainly on the blood tests described above, that Plaintiff's alcohol use had reached a harmful

---

[6](...continued)
levels of GGT can result from a variety of circumstances, including liver disease, cancer, or Tylenol overdose, as well as from heavy drinking. (Def.'s 56.1 ¶ 62; Altman Dep., Ex. F to Def.'s 56.1, at 58.) The CDT test detects reductions in the number of molecules associated with carbohydrate transfer; such a reduction is associated specifically with alcohol abuse. (Altman Dep. at 59.) Plaintiff has denied Defendant's assertions about these tests, contending that they are not "conclusive," but Defendant does not assert the contrary. (Plaintiff's Response ¶ 62.) Plaintiff has offered no medical testimony rebutting Dr. Altman's testimony about the importance and meaning of the GGT and CDT tests. Nor is Plaintiff's assertion that Dr. Altman "did not know many details about CDT and GGT tests" supported by the fact that Dr. Altman was unfamiliar with the effect, if any, that a homeopathic medication might have on these tests. (Plaintiff's 56.1 ¶ 120.) Plaintiff points out that Dr. Altman refused to speculate about the test results for "a person who may have been a heavy drinker twenty (20) years ago, drank very moderately over the next twenty (20) years, and then had a few drinks immediately prior to the blood test . . . ." (Id.) In the court's view, the doctor's refusal to answer that question does not establish that he "did not know many details." In any event, no evidence in the record suggests that the hypothetical posed by Plaintiff's counsel is relevant here.

level. Whether or not alcohol was the cause, in Dr. Altman's view, Plaintiff's cognitive deficits disqualified him from meeting the FAA's neurological standards for pilots. (Def.'s 56.1 ¶ 64.) Dr. Altman met with Plaintiff on January 20, 2001 and reviewed the test results with him. (Id. ¶ 65.) He suggested that if Plaintiff believed the results were valid, "then that would lead him down a path of getting help"; if, on the other hand, Plaintiff believed the cognitive impairment results were not evidence of harmful drinking, then Dr. Altman encouraged him "to seek a second opinion," as other doctors might reach a different conclusion. (Id. ¶ 66; Plaintiff's Response ¶ 66.)

In Dr. Kowalsky's opinion, the reports from Dr. Altman and Dr. Georgemiller indicated that Plaintiff was a risk to flight safety and did not meet FAA medical standards. (Def.'s 56.1 ¶ 68.) Plaintiff believes the reports did not support these conclusions. (Plaintiff's Response ¶ 68.) On February 8, 2001, Dr. Kowalsky advised Plaintiff that he was being withheld from flight duty pending a determination by the FAA. (Def.'s 56.1 ¶ 67.) Dr. Kowalsky asked Plaintiff to provide a medical release to enable Dr. Kowalsky to provide his records to the FAA, but Plaintiff declined, noting that he questioned the exam results and that he wanted a second and perhaps a third opinion. (Id.)

**Treatment in April 2001 and Beyond**

After meeting with Dr. Kowalsky, Plaintiff consulted with the medical support staff available through the union as well as with Mike Smith, a union officer who worked with Defendant's EAP (presumably, "employee assistance program"). (Id. ¶ 69.) Plaintiff claims a union physician warned him that if he sought a second opinion, Defendant "has unlimited resources, and they would break me by testing me test after test until they got something on me." (Plaintiff's Response ¶ 60, citing Plaintiff's Dep., Ex. A to Def.'s 56.1, at 147.) Accordingly, for what he called "financial considerations," in March 2001 Plaintiff enrolled in an alcohol rehabilitation program at the Betty Ford Center. (Def.'s 56.1 ¶ 70.)

Plaintiff remained at the Betty Ford Center from March 28 until April 25, 2001. (Id. ¶ 71.)

At some point during his therapy, Plaintiff stated that he had undergone a "conversion" and admitted that he is an alcoholic. (Plaintiff's Response ¶ 72.) He testified, however, that he is not an alcoholic and believes he never has been an alcoholic, and that he made the admission because he felt it was required of him. (Plaintiff's Dep., at 163-67.) Plaintiff claims he immediately ceased drinking all alcohol in March 2001 and has not had any alcohol since then. (*Id.*) Upon Plaintiff's discharge from the Betty Ford Center, Center staff sent a "medical discharge seminar" to Defendant, identifying his final diagnosis as "alcohol dependence" and "nicotine dependence." (Def.'s 56.1 ¶ 74.) The Center furnished Plaintiff with a "continuing care plan" recommending "[a]bstinence from mind altering substances," participation in daily Alcoholics Anonymous meetings for 90 days, and association with an AA sponsor. (Continuing Care Plan, Ex. 27 to Plaintiff's Dep.)

Following his discharge, Plaintiff saw a counselor named Toni Curry on just one occasion. He attended weekly meetings of a group of alcoholic pilots in Atlanta called "Birds of a Feather" from May 2001 through April 2003, but asserts that his enrollment in that group ended "due to insurance issues." He also attended fewer than 20 AA meetings, and meetings of alcoholic pilots known as "domicile meetings" or "pilot monitoring meetings" from May 2001 through October 2002. (Def.'s 56.1 ¶ 76; Plaintiff's Response ¶ 76.) At one of these meetings, on June 20, 2001, according to Dr. Kowalsky's notes, Plaintiff acknowledged that he has a "nasty attitude" and is "an angry person, with or without alcohol." (Def.'s 56.1 ¶ 78.) On another occasion, Plaintiff abruptly left the meeting after two hours, before other attendees had completed their discussion (*id.* ¶ 79); Plaintiff explained that the meeting in question was substantially longer than the typical 90-minute duration and that he left when he did in order to catch a flight home. (Plaintiff's Response ¶ 79.) Dr. Kowalsky's notes of a December 19, 2001 meeting reflect that Plaintiff refused to answer questions about what he had learned from the meetings and from the AA guidebook, interrupted another attendee, and left the meeting with the words, "We'll resume this next year." (Def.'s 56.1 ¶ 80.) When his turn came to speak at an August 21, 2002 meeting, Plaintiff declined, stating, "I'll

pass." (*Id.* ¶ 81.)

Dr. Kowalsky noted that union and management representatives who attended the meetings often made comments consistent with Dr. Kowalsky's own observations about Plaintiff's attitude toward, and level of participation in, the meetings. (*Id.* ¶ 82.) Reports from the group sessions that Plaintiff attended in Atlanta include the observation that, as of November 20, 2001, Plaintiff had "done a lot of work on improving his attitude about being in the group. He is clear that he is an alcoholic, but he is not at all feeling disposed to participate in 12 step meetings." (*Id.* ¶ 84.) A similar report from February 15, 2002 includes the comment that Plaintiff had "steadfastly refused to participate in any program other than the Pilots Aircraft Group, and he remains angry about the requirements." (*Id.* ¶ 85) In fact, as noted earlier, Plaintiff attended both the weekly "Birds of a Feather" meeting from May 2001 through April 2003 and the monthly domicile meetings from May 2001 through October 2002. (Plaintiff's Response ¶ 85.)

**Plaintiff's Requests to Resume Flying**

In a January 14, 2002 letter to Dr. Kowalsky, Plaintiff complained that although he had been abstinent since March 2001, and had attended monthly and weekly meetings, Defendant had not indicated when he could resume flying. In Plaintiff's view, American was in violation of Department of Transportation ("DOT") and FAA Alcohol and Drug Abuse Guidelines. (Def.'s 56.1 ¶ 86; Plaintiff's Response ¶ 86.) He believed American was required by those regulations to send him for further evaluation by a "Substance Abuse Professional." (Plaintiff's Jan. 14, 2002 letter, Ex. 33 to Plaintiff's Dep.) In his response, dated January 18, 2002, Dr. Kowalsky denied that the DOT guidelines were applicable. (Def.'s 56.1 ¶ 87.)

On February 8, 2002, Plaintiff met with American's chief medical officer, Dr. Bettes, and with several pilots who are admitted alcoholics. Plaintiff was presented (the record does not indicate by whom) with two options: to remain off flight status or to enter a treatment program in Minnesota.

12

Plaintiff refused, explaining that he had attended the Betty Ford program, had abstained from alcohol since March of the previous year, and had attended weekly and monthly meetings. Plaintiff asserted that he is "not an alcoholic" and pointed out that no other pilot had been required to undergo a second round of treatment. (Plaintiff's Response ¶ 88; Dr. Kowalsky's notes, Ex. 1 to Kowalsky Dep.)

On May 29, 2002,[7] Plaintiff filed a charge of discrimination with the EEOC. The following day, on May 30, 2002, Plaintiff again wrote to Dr. Kowalsky, referring to his January letter and his efforts toward recovery, and asked what more he needed to do in order to complete the recertification process. (Def.'s 56.1 ¶ 89; Pltf.'s 56.1(b)(3)(B) ¶ 136.) In a response dated June 13, 2002, Dr. Kowalsky advised Plaintiff that an updated evaluation would be necessary in order to prepare documentation for a request to the FAA for a "special issuance," and forwarded medical release forms so that Plaintiff's records could be sent to the FAA and to an Atlanta psychiatrist. (Id. ¶ 90.) Dr. Kowalsky sent a second letter, again including the medical release forms, on July 3, 2002, and upon learning that this second letter was not delivered, Dr. Kowalsky re-sent it on July 17, 2002. (Id. ¶ 92.)

On or about August 21, 2002, Plaintiff met with Dr. Kowalsky and Paul Hoover, American's EAP coordinator. When asked why he had not responded to Dr. Kowalsky's June and July letters, Plaintiff failed to respond, instead stating that he had filed a lawsuit. (Id. ¶ 93.) (While Plaintiff's charge of discrimination was before the EEOC at this point, this lawsuit was not in fact filed until December 2002.) Dr. Kowalsky explained that regardless of any legal action, the FAA would need to determine his eligibility for flight status. (Id.) Dr. Kowalsky asked Plaintiff several times whether he wanted documentation submitted to the FAA, and Plaintiff responded, "at your discretion." (Id.)

---

[7] Neither party has submitted a copy of the EEOC charge, nor was it made part of Plaintiff's complaint. Defendant asserts that the charge was filed on March 24, 2002 (Defendant's Memorandum of Law in Support of Summary Judgment, at 8 n.4), but Plaintiff's complaint alleges that the charge was filed on May 29, 2002.

Dr. Kowalsky warned Plaintiff that American would not transmit his information to the FAA unless Plaintiff provided an updated medical release form. (*Id.*) Dr. Kowalsky confirmed this conversation in a letter of August 27, 2002. (*Id.* ¶ 94.) On August 25, 2002, Plaintiff sent his own letter to Dr. Kowalsky, stating that he did not trust him and questioning why his information had not been sent to the FAA earlier. (*Id.* ¶ 95.)

> Dr. Kowalsky responded to this question in a letter dated September 10, 2002:
>
> In my best medical judgment, your aftercare reports and clinical progress as evidenced in your monthly pilot monitoring meetings do not demonstrate significant signs of recovery. It is for that reason that your medical documentation has not yet been submitted to the Federal Air Surgeon's staff.
>
> However, because you stated in your letter that you do not trust me, I am willing to allow the Federal Air Surgeon's office to make its own determination about your recovery. If you specifically ask me to do so, in writing, I will submit your medical documentation to the Federal Air Surgeon's office with a request for a special issuance, with or without updated psychiatric and neuropsychological that the FAA routinely requires.

(*Id.* ¶ 96; Ex. 40 to Plaintiff's Dep.) Plaintiff denies that he is an alcoholic and denies any need for treatment, but acknowledges that Dr. Kowalsky sent this letter. (Plaintiff's Response ¶ 96.) He admits, further, Defendant's assertion that he never provided American with any medical evidence that he did not suffer from deficits identified by Dr. Georgemiller, or that the Betty Ford diagnosis of alcohol dependence was incorrect. (Def.'s 56.1 ¶ 102; Plaintiff's Response ¶ 102.)

Plaintiff points out that Dr. Georgemiller did not conclude that his relative deficits should bar Plaintiff from flying. (*Id.*) He asserts, further, that Dr. Altman "specifically found that Plaintiff was not an alcoholic" (*id.*); rather, Dr. Altman merely stated that he was unable to make such a diagnosis under DSM-IV standards based on the "history provided to [him]." (Altman Dep., at 74.) Plaintiff's first class medical certificate, issued by the FAA in October 2000, expired six months after its issuance and has not been renewed. (Def.'s 56.1 ¶ 103.) Nor has Plaintiff sought a "special issuance" from the FAA. (*Id.* ¶ 104.) Since expiration of his October 2000 medical certificate, Plaintiff has not been qualified under FAA regulations to fly a commercial aircraft. (*Id.* ¶ 105.)

14

**Plaintiff's Race Discrimination Claims**

Plaintiff believes the only person at American who discriminated against him on the basis of his race is Captain Pospisil. (*Id.* ¶ 108.) He admits that no racist statements were ever made by Captain Pospisil, however, or by Captain Allen, Dr. Kowalsky, or Dr. Altman. (*Id.* ¶ 107.) Plaintiff contends that Captain Pospisil wrote "false notes" about Plaintiff's conduct during the monthly meetings. (Plaintiff's Response ¶ 109.) He notes, further, that it was Captain Pospisil who sent Plaintiff for a fitness-for-duty exam based on asserted changes in behavior that dated back to April of 2000. (*Id.*) Captain Pospisil has sent only one other employee for a fitness-for-duty exam, a white pilot who experienced emotional distress during his "initial operating experience." (Def.'s 56.1 ¶ 110.) Plaintiff asserts that this pilot was repeatedly unable to perform his duties, suffered from "personal problems," and "experienced repeated uncontrollable crying spells for no discernable reason." (Plaintiff's Response ¶ 110.) Plaintiff claims that "many pilots have had arguments with agents or customer services managers" but have not been referred for a medical or psychological evaluation as a result. (Pltf.'s 56.1(b)(3)(B) ¶ 119.) As Defendant notes, however, Plaintiff has no admissible evidence concerning the disciplinary records of other pilots. (Def.'s Response ¶ 119.)

Of those pilots with substance abuse issues whose involvement with American's Employee Assistance Program began in 2000 and 2001, none returned to duty until he or she completed a substance abuse program, remained abstinent, successfully completed aftercare requirements, passed a fitness-for-duty examination, and obtained a special issuance from the FAA. (Def.'s 56.1 ¶ 111.) Plaintiff nevertheless believes that white pilots in circumstances similar to his were treated more favorably by American. He cites the case of white pilot S.W., who, Plaintiff asserts, "was allowed to resume flying despite his substance or alcohol dependency." (Pltf.'s 56.1(b)(3)(B) ¶ 128.) In addition, he identifies several white pilots who were away from work for shorter time

periods than he while attending rehabilitation and aftercare programs before being allowed to return to flight status: AA (eight months); GG (sixteen months); HH (seven months); JJ (fourteen months); NN (fourteen months); OO (eleven months); SS (eight months). (*Id.* ¶¶ 129-135.) Plaintiff asserts, further, that he was qualified to perform other positions with American, including that of flight engineer, flight data specialist, aviation or safety inspector, S-80 ground school instructor, S-80 simulator instructor, and safety coordinator. (*Id.* ¶ 137.) Defendant correctly notes that Plaintiff has presented no evidence regarding the job duties, licensing requirements, collective bargaining status, or availability of any of these positions. (Def.'s Response ¶ 137.)

## DISCUSSION

I.     **Timely Charge Filing Requirement**

Plaintiff alleges that American Airlines removed him from service as a pilot in December 2000, falsely labeled him as an alcoholic, required him to undergo treatment for this purported condition, and then refused to reinstate him after he completed the required program. He charges American with violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* An individual asserting a claim under either of these statutes is required to file a charge of discrimination within 300 days after the alleged unlawful employment practice. *Flannery v. Recording Industry Ass'n of America*, 354 F.3d 632 (7th Cir. 2004) (ADA); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (Title VII). It is well-recognized that a plaintiff may proceed in a federal lawsuit only on those claims that were presented in his underlying EEOC charge. *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994).

Plaintiff Terry did file a charge of discrimination; he asserts that he filed on May 29, 2002, while Defendant assigns the earlier date of March 24, 2002. Even assuming that Defendant is correct (the earlier date is more favorable to Plaintiff here), his claims in this court are limited to

events that occurred on or after May of 2001. In his memorandum in opposition to Defendant's motion for summary judgment, Plaintiff devotes substantial attention to the events of 2000 and 2001. He challenges Defendant's directing him to undergo a fitness-for-duty examination in late 2000. (Plaintiff's Response to Defendant's Motion for Summary Judgment (hereinafter, "Pl.'s Resp."), at 8.) He contends American acted unlawfully by withholding him from duty based upon reports prepared by Dr. Altman and Dr. Georgemiller in December 2000 and January 2001. (*Id.* at 3.) With respect to race discrimination, similarly, Plaintiff asserts that he "did have a valid certificate at the time Defendant discriminated against him when it improperly forced him to undergo a fitness for duty exam and ordered him not to fly anymore based on faulty and inconclusive medical reports." (*Id.* at 10.) It is undisputed that the direction to undergo a fitness-for-duty examination and Plaintiff's removal from flight status occurred months before May 2001.

In addition to these matters, Plaintiff has identified alleged violations that occurred within the 300 days of filing of his charge of discrimination. He claims that Defendant violated his rights when it failed to make any attempt to accommodate him "after he asked about returning to work as a pilot," (*id.* at 10), a request this court understands occurred in January 2002. He asserts that American's refusal to return him to flying in 2002 was an act of race discrimination, as well, observing that "numerous white pilots returned to flying after relatively brief periods of time though they were clearly alcoholics and had alcohol-related problems." (*Id.* at 12.) Plaintiff does not make a "continuing violation" argument, and in any event, American's (a) direction that he proceed with a fitness-for-duty examination, and (b) grounding him from flight status are arguably discrete acts of discrimination as that term is explained in *Morgan*, 536 U.S. at 113. Accordingly, the court proceeds to address Defendant's motion for summary judgment on Plaintiff's failure-to-accommodate claim and his claim that American's denial, beginning in January 2002, of his request to resume flying, was based on his race.

17

## II.    Summary Judgment Standards

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. Where factual matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 802 (7th Cir. 2000).

In determining whether there is a genuine issue for trial, the court is "entitled to limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statements." *Bordelon v. Chicago Sch. Reform Bd. of Trustees,* 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record evidence and not adequately rebutted, the court is entitled to presume that statement is true for purposes of summary judgment. Where the denial of a proposed statement is not supported by the material cited, the moving party's assertion may be deemed admitted, regardless of what contrary evidence is in the record. *Id.; see also Rogers v. City of Chicago,* 320 F.3d 748, 751 (7th Cir. 2003); *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir. 2001).

American contends it is entitled to summary judgment in its favor on two grounds: First, American says Plaintiff has not established that American perceived or regarded him as disabled within the meaning of the ADA. Second, American contends that there are no disputes concerning the fact that American kept him off flight duty out of genuine safety concerns and FAA regulations.

According to American, Plaintiff's failure to satisfy FAA medical standards renders him a direct threat to safety as a matter of law. This direct threat defeats his perceived disability claim as a matter of law and constitutes a legitimate, nondiscriminatory reason for alleged disparate treatment on the basis of race.

## III.    Claim of "Perceived" or "Regarded As" Disabled

In order to establish that American Airlines regarded him as disabled, Plaintiff must show that the decision maker believed he had a substantially limiting impairment that he did not have, or believed that he had a substantially limiting impairment when the impairment was not actually so limiting. *See* 29 C.F.R. § 1630.2(l); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 490 (1999). Plaintiff's complaint alleges that Defendant perceived him as an alcoholic. Defendant challenges this allegation; American concedes that Dr. Altman's and Dr. Georgemiller's reports disclosed certain cognitive deficits, and that Dr. Altman believed the most likely explanation for these deficits was alcohol abuse. Dr. Altman nevertheless asserted he was unable to make a diagnosis of alcoholism under DSM-IV standards. American notes, further, that Plaintiff himself admitted to his therapists at Betty Ford that he is an alcoholic (an admission he has since withdrawn).

Even assuming that this evidence supports a finding that American officials perceived Plaintiff as suffering from alcoholism, Defendant asserts, this would not establish that American believed that his condition renders Plaintiff unable to perform a major life activity. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 196-96 (2002) (expression "substantially limited" is defined as inability to perform a major life activity that an average person in the general population can perform). In at least a handful of decisions, courts have concluded that perceiving an employee as an alcoholic is not enough to establish that the employer considered him disabled.

In *Sullivan v. Neiman Marcus Group, Inc.*, 358 F.3d 110 (1st Cir. 2004), plaintiff acknowledged alcoholism, but argued, as does Terry in this case, that he was not impaired in his

ability to work. *Id.* at 116. The court observed that it is possible for an employer to mistakenly believe that a worker's alcoholism disabled him from working. The plaintiff there, however, had presented no evidence that his own employer believed he could not perform the essential functions of either a class of jobs or a broad range of jobs in various classes, and therefore could not demonstrate that the employer regarded him as disabled. *Id.* at 118. *See also Landingham v. Potter*, No. 99 C 5733, 2003 WL 22205617 (N.D. Ill. Sept. 23, 2003) (fact that employee was referred to the employee assistance program and participated in treatment not enough to establish that his alcoholism was substantially limiting); *Nauseda v. Tootsie Roll Indus., Inc.*, No. 02 C 2150, 2003 WL 1873519 (N.D. Ill. Apr. 15, 2003) (fact that employee's alcoholism "affected" sleeping and communication did not rise to the level of substantially affecting them). *But cf. Pugh v. City of Attica*, 259 F.3d 619 (7th Cir. 2001) (assuming that city employee perceived as an alcoholic was "perceived as disabled," her ADA case nevertheless failed because she was discharged for misappropriation of funds); *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662 (7th Cir. 2000) (plaintiff physician was terminated for use of alcohol, not for perceived disability of alcoholism).

Plaintiff may have felt compelled to admit to being an alcoholic during the course of his therapy, and American apparently required him to undergo a 12-step program. At base, however, Plaintiff has merely established that American doubted his ability to pilot a commercial airplane. Plaintiff does not contend, nor could he, that inability to meet the rigorous physical standards for commercial pilots can be characterized as a disability. The Supreme Court made that clear in *Sutton*, a case involving two sisters suffering from myopia – an eye condition that left them with vision of 20/200 or worse in each eye – who applied to be airline pilots. The airline declined to hire the plaintiffs because neither could meet the requirement that pilots have uncorrected vision of 20/100 or better. 527 U.S. at 475-77. The plaintiffs filed a lawsuit claiming, among other things, that the airline perceived them as disabled in violation of the ADA. The Court disagreed and concluded that the mere fact that plaintiffs did not meet the vision standards for airline pilots was

not by itself proof that the airline perceived them as substantially limited in a broad class of jobs. *Id.* at 492-93. *See also Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 954 (7th Cir. 2000) (to be perceived as substantially limited in the major life activity of working, plaintiff must show that the employer believed he was substantially limited in a broad range of jobs). As in *Sutton*, the fact that American perceived Plaintiff as an alcoholic and, thus, unable to fly a commercial airplane does not demonstrate that American also perceived him as precluded from performing a wide range of jobs.

Even if American did perceive Plaintiff as disabled, he is not a "qualified individual with a disability" because his FAA certification lapsed in 2001 and he has not renewed it. To establish a claim under the ADA, a plaintiff must show not only that he has a "disability," but also that he is able to perform the essential functions of his job, with or without reasonable accommodation. 42 U.S.C. § 12111(8); *Byrne v. Avon Products, Inc.*, 328 F.3d 379, 380 (7th Cir. 2003). It is undisputed that federal regulations require any pilot to hold a first class medical certificate from the Federal Air Surgeon of the FAA, and that Plaintiff does not have a current certificate. As a result, he is not qualified to perform the job of pilot.

As for Plaintiff's suggestion that American failed to accommodate his disability, that claim was not raised in his EEOC charge and is barred.[8] *Stansberry v. Uhlich Children's Home*, 264 F. Supp. 2d 681 (N.D. Ill. 2003) (failure to accommodate claim barred where not raised in underlying charge of discrimination). In addition, at least one Court of Appeals has declined to hold that an employer is required to accommodate a perceived disability. *See Williams v. Philadelphia Housing Auth. Police Dep't*, 380 F.3d 751 (3d Cir. 2004). *See also Weber v. Strippit, Inc.*, 186 F.3d 907 (8th Cir. 1999). In any event, Plaintiff, who insists he is fully capable of performing as a captain for

---

[8] As noted, the charge itself is not in the record, but Plaintiff never rebutted American's assertion that it did not include a failure to accommodate claim – not even at oral argument on this motion.

21

American, never requested an accommodation, and must at least intimate such a request in order to trigger the "interactive process" under *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996) ("[a]n employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations – a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate"). Plaintiff offered no evidence of any vacant positions to which he could have been assigned, nor evidence, apart from his own affidavit, that he was qualified for other positions. Thus, American is entitled to summary judgment on Plaintiff's failure to accommodate claim.

## IV. Race Discrimination Claim

In addition to his claim under the Americans with Disabilities Act, Plaintiff asserts that American discriminated against him on the basis of his race when it refused to return him to flight duty in 2002. To survive summary judgment on this claim, Terry may proceed by the "direct method," offering either an outright admission of discriminatory animus or a "convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action."

*Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (citations omitted). Alternatively, Terry may proceed under the indirect "burden-shifting" approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.

Terry here effectively acknowledges he has no direct evidence of discrimination and invokes the indirect method by comparing his treatment with that of white pilots temporarily grounded for alcohol-related reasons. According to Terry, "numerous white pilots returned to flying after relatively brief periods of time" despite alcohol problems. (Pl.'s Resp., at 10.) His effort to proceed under this approach fails, however, for a reason Terry himself identifies in his memorandum of law: he did not (and to this court's knowledge, does not yet) have a current valid medical certificate

issued by FAA. (*Id.*) It is undisputed that his certificate expired early in 2001 and had not been renewed as of January 2002, when he formally requested to resume flying.

Plaintiff devotes substantial attention to what he believes is Captain Pospisil's unfair treatment of him. He insists he "did not act inappropriately" in either of the April 2000 incidents and faults American for failing to discipline other employees involved in these incidents, who were in Plaintiff's view themselves guilty of making false allegations, using an unprofessional tone, and other misconduct. (*Id.* at 11.) He emphasizes the fact that American's interrogatory answers did not identify any other pilot referred by Pospisil for a fitness examination. As explained earlier, however, Terry did not make a "continuing violation" argument, and in the court's view, Pospisil's decision to refer Terry for an examination was a discrete act, which he could challenge only in a timely charge.

Terry's timely claim is that American refused his request to return to the air in January 2002, but on this claim he is unable to establish a prima facie case of discrimination under the traditional burden-shifting analysis because he did not have FAA certification. Without that certification, he was not qualified to fly a commercial airplane. Terry does not contend otherwise. He suggests other employees with records of alcohol problems were returned to flight status in less time than he, but there is no evidence that those other employees failed to meet American's policy requirements of completing a program, remaining abstinent, passing a fitness exam, and obtaining an FAA special issuance.

In June and again in September 2002, Dr. Kowalsky reminded Plaintiff that in Kowalsky's judgment, he had not yet demonstrated recovery, but invited him to send medical documentation to the Federal Air Surgeon in order to seek a "special issuance." Plaintiff obviously objects to various aspects of American's policy. He may believe that the fact that he has remained abstinent since 2001 (a fact the court presumes is true for purposes of this motion) is sufficient to demonstrate that alcohol is not a current problem for him. As is often observed, however, the court

23

is not a "superpersonnel department" and has no authority to review the wisdom of a personnel policy or the propriety of a defendant's business decision. *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). The court need not pass on the wisdom of American's requirements that a pilot suspected of substance abuse complete a treatment program as prescribed by the airline. Plaintiff may well quarrel with some of those requirements, but he cannot challenge American's insistence that its pilots be FAA-qualified to fly.

More importantly for purposes of his race discrimination claim, Plaintiff can prevail here only if he can show that American's policies were applied differently to him than to white pilots. No such showing is made on this record. American asserts that no pilot suspected of substance abuse has returned to duty without completion of a treatment program, aftercare requirements, a fitness examination, and an FAA special issuance. Plaintiff has not offered any evidence to rebut that assertion.

American Airlines is entitled to summary judgment on Plaintiff's race discrimination claim.

## CONCLUSION

For the reasons stated above, American Airlines's motion for summary judgment (Docket No. 15-1) is granted.

ENTER:

Dated: September 30, 2004

REBECCA R. PALLMEYER
United States District Judge

24